JD:ELM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A NAVY BLUE SAMSUNG S9+ WITH IMEI 357633091107208, BLACK IPHONE MODEL A1660 WITH FCC ID BCGE3085A AND IC 579C-E3085A, AND WHITE SAMSUNG GALAXY AMP PRIME WITH IMEI 356519079241146, CURRENTLY LOCATED IN THE EASTERN DISTRICT OF NEW YORK | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>18-MJ-844 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, MICHAEL YUN, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and have since December 2016. I have personally participated in the investigation of narcotics trafficking conspiracies, and the importation and distribution of narcotics into the United States. During my time as a Special Agent, I have participated in numerous investigations and arrests, the debriefing of cooperating witnesses and informants, and the execution of numerous search warrants, including search warrants for electronic devices. As a result of my training and experience, I am familiar with the techniques and methods of

operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.  The property to be searched is: one NAVY BLUE SAMSUNG S9+ WITH IMEI 357633091107208 ("Device 1"), one BLACK IPHONE MODEL A1660 WITH FCC ID BCGE3085A AND IC 579C-E3085A ("Device 2"), and one WHITE SAMSUNG GALAXY AMP PRIME WITH IMEI 356519079241146 ("Device 3," and, together with Device 1 and Device 2, the "Devices"). The Devices are currently in the possession of the HSI in the Eastern District of New York.

5.  The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

6.  On July 28, 2018, during the late evening hours, JOSE ROBERTO BALDERRABANO arrived at John F. Kennedy International Airport in Queens, New York ("JFK Airport") aboard Interjet flight 4O 2992 from Mexico City, Mexico. Upon arrival at JFK Airport, BALDERRABANO was selected for a border enforcement examination by United States Customs and Border Protection ("CBP") officers. BALDERRABANO presented a backpack, one carryon bag, and a checked "Triforce" brand suitcase ("Suitcase 1") for inspection.

7.  A personal search was conducted with negative results. A search of Suitcase 1 revealed a box that contained eleven blocks of what appeared to be individually wrapped, soft

cheeses and one brownish colored block that was hard to the touch. The brownish colored block was wrapped in multiple layers of plastic. The block was probed, and the substance contained therein field tested positive for heroin. Additionally, the Suitcase contained a body lotion bottle that contained a white, creamy substance that field tested positive for heroin. Following this discovery, at approximately 12:05 a.m. on July 29, 2018, JOSE ROBERTO BALDERRABANO was arrested. Device 1 was seized from BALDERRABANO's person at the border, and subject to his arrest.

8. After his arrest, JOSE ROBERTO BALDERRABANO was advised of his Miranda rights, and waived those rights and agreed to speak with law enforcement. BALDERRABANO admitted, in sum and substance and in part, that he knew that he was bringing narcotics into the United States. BALDERRABANO also stated that he was to be paid $1,500 for doing so by RAFAEL BELLO, and that BELLO was going to pick BALDERRABANO up at JFK Airport.

9. After his arrest, JOSE ROBERTO BALDERRABANO agreed to assist with law enforcement's investigation. BALDERRABANO made a series of consensually monitored communications with the defendant RAFAEL BELLO. At approximately 2:16 a.m. on July 29, 2018, BALDERRABANO sent BELLO a text message explaining that his flight had been delayed and that he had a problem with his passport. BALDERRABANO then asked about BELLO's whereabouts, and BELLO replied: "we left." At approximately 2:41 a.m., BALDERRABANO sent BELLO a text message asking where he should wait for BELLO. BELLO replied that he would be at JFK Airport in ten minutes.

10. RAFAEL BELLO then called JOSE ROBERTO BALDERRABANO on his cellphone. BALDERRABANO explained that he was held up in immigration, and explained

3

that there was no problem. BELLO agreed to meet BALDERRABANO outside of Terminal 7 at JFK Airport. BALDERRABANO told law enforcement officers that he expected BELLO to arrive in a green or turquoise Honda Accord.

11. Thereafter, as law enforcement officers surveilled the area, a blue Honda Accord (the "Accord") arrived at the arrivals pickup area for Terminal 7 at JFK Airport. RAFAEL BELLO was driving, and GABRIELA CORTES HOYOS was riding in the passenger seat. BELLO pulled up to the curb where JOSE ROBERTO BALDERRABANO was waiting, got out of the Accord and greeted BALDERRABANO. CORTES HOYOS also got out of the Accord. At this point, BELLO and CORTES HOYOS were placed under arrest.

12. The defendant RAFAEL BELLO's person was searched incident to his arrest. Law enforcement officers discovered approximately $1,500 in United States currency in his pocket. Law enforcement officers also discovered Device 2 and Device 3 on BELLO's person, and seized Device 2 and Device 3 incident to BELLO's arrest. Law enforcement officers also searched the Accord following the arrests. Approximately $1,500 in United States currency and two cellphones were discovered in the Accord's center console. A black duffle bag was in the trunk of the Accord ("Suitcase 2") and a blue rolling suitcase was found in the backseat ("Suitcase 3"). Suitcase 2 and Suitcase 3 each contained a box of twelve individually wrapped cheeses, of the same brand and type concealed within Suitcase 1.

13. GABRIELA CORTES HOYOS was advised of her <u>Miranda</u> rights, waived those rights and agreed to speak with law enforcement. CORTES HOYOS admitted that she was in a relationship with the defendant RAFAEL BELLO. CORTES HOYOS stated that she had flown into JFK Airport from Mexico City earlier that evening. CORTES HOYOS admitted that Suitcase 2, Suitcase 3 and all of their contents belonged to her. She also stated that she had

4

previously purchased the same brand and type of local cheese from a town in Mexico on behalf of a deli in Yonkers, New York. Field testing of the cheeses within Suitcase 2 and Suitcase 3 was inconclusive. CORTES HOYOS provided law enforcement officers with her address and contact information, and was released from custody. The cheeses were retained by law enforcement officers for further testing.

14. Following GABRIELA CORTES HOYOS release, JOSE ROBERTO BALDERRABANO stated that CORTES HOYOS had introduced BALDERRABANO to RAFAEL BELLO. BALDERRABANO explained that CORTES HOYOS provided him with Suitcase 1, including the narcotics therein, at a bus station prior to BALDERRABANO boarding his flight to JFK Airport.

15. A consensual search of JOSE ROBERTO BALDERRABANO's cellphone – Device 1 – revealed a series of text message communications between BALDERRABANO and a phone number that BALDERRABANO identified as belonging to the defendant RAFAEL BELLO.[1] Between July 3 and July 27, 2018, BALDERRABANO and BELLO exchanged a series of text messages, including as follows, in sum and substance and in part:

    a. On or about July 3, 2018, BELLO asked when BALDERRABANO was planning to go to Mexico. On or about July 4, 2018, BALDERRABANO indicated that he planning to go on July 23, 2018.

    b. On or about July 15, 2018, BELLO asked BALDERRABANO, in sum and substance and in part: "Do you have your ticket?" BALDERRABANO said: "Not yet." BELLO replied: "I'll check La Chava for cheaper tickets."

---

[1] JOSE ROBERTO BALDERRABANO contacted RAFAEL BELLO to arrange the controlled delivery, as described above, at this number. Law enforcement officers do not have subscriber information for this phone number at this time.

5

BALDERRABANO informed BELLO that he would be returning on Saturday at 10:30 p.m.

  c. On or about July 26, 2018, BELLO asked BALDERRABANO if everything was good for Saturday. BALDERRABANO replied, in sum and substance and in part: "Yes, when am I meeting Gaby?"

  d. On or about July 27, 2018, BELLO asked BALDERRABANO if he could meet with BELLO's girlfriend in the late afternoon. BALDERRABANO replied that he would text BELLO's girlfriend.

 16. The consensual search of JOSE ROBERTO BALDERRABANO's cellphone also revealed a series of text message communications with a Mexican phone number ending in "4580" (the "4580 Phone Number"). Between July 27 and July 28, 2018, BALDERRABANO and the 4580 Phone Number exchanged a series of text messages, including as follows, in sum and substance and in part:

  e. On July 27, 2018, at approximately 6:53 p.m., the 4580 Phone Number stated "I leave on Sunday" and BALDERRABANO replied that he was leaving Saturday morning. The 4580 Phone Number stated, in sum and substance and in part: "What time are you leaving? I'm leaving Sunday, that's why I want to give it to you today." BALDERRABANO and the 4580 Phone Number planned to meet at 11:00 a.m. the following morning, at a restaurant close to a bus terminal that goes to the Mexico City airport.

  f. On or about Saturday, July 28, 2018, at approximately 11:23 a.m., the 4580 Phone Number asked BALDERRABANO where he was. At approximately 12:38 p.m., BALDERRABANO stated that he was five minutes away.

g.  On or about Saturday, July 28, 2018, at approximately 1:15 p.m., BALDERRABANO stated, in sum and substance and in part: "Sorry, and congratulations. I hope everything goes well." The 4580 Phone Number replied: "Thank you. Let me know if you need anything. Did you take the bus?" BALDERRABANO replied that the bus would leave in 15 minutes.

h.  On or about Sunday, July 2, 2018 at approximately 12:07 a.m., the 4580 Phone Number stated, in sum and substance and in part: "Bring 12 cheese, 2 beers, 1 cream for pregnant women. Tell them it's for your girlfriend, lol. Good luck. Take care. Erase all these messages. My flight is at 7."

17.  GABRIELA CORTES HOYOS provided the 4580 Phone Number to law enforcement officers prior to her release, and identified the 4580 Phone Number as her phone number. Additionally, during the afternoon hours of July 29, 2018, law enforcement officers who conducted CORTES HOYOS's post-arrest interview called the 4580 Phone Number. A woman answered, and indicated that she was CORTES HOYOS. Additionally, the officers recognized her voice as belonging to CORTES HOYOS.

18.  On August 18, 2018, a grand jury in the Eastern District of New York issued a three-count indictment charging: (1) JOSE ROBERTO BALDERRABANO, RAFAEL BELLO and GABRIEL CORTES HOYOS with conspiracy to distribute and possess with intent to distribute heroin, in violation of Title 21, United States Code, Section 846; (2) BALDERRABANO with importation of heroin, in violation of Title 21, United States Code, Section 952(a) and 960(a)(1); and (3) BALDERRABANO with possession of heroin with intent to distribute, in violation of Title 21, United States Code, Section 841.

## THE DEVICE

19. There is probable cause to believe that JOSE ROBERTO BALDERRABANO, RAFAEL BELLO and GABRIELA CORTES HOYOS have committed violations of federal criminal law, including drug trafficking conspiracy, importing heroin into the United States from Mexico and distributing and possessing with intent to distribute heroin, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952(a)(1), and 963. Based on the fact that Device 1 was seized from BALDERRABANO at the time of his arrest, Device 2 and Device 3 were seized from BELLO at the time of his arrest, law enforcement officers observed BALDERRABANO use Device 1 to contact BELLO on Device 2 or Device 3 as part of the controlled delivery, and law enforcement officers observed communications between BALDERRABANO, BELLO and CORTES HOYOS and in furtherance of the drug trafficking conspiracy on Device 1 pursuant to a consensual search, there is also probable cause to search the Device described in Attachment A for evidence, instrumentalities, contraband and/or fruits of these crimes as further described in Attachment B.

20. Based on my training and experience, I believe that a review of the information stored on the Devices, including text messages sent or received by JOSE ROBERTO BALDERRABANO, RAFAEL BELLO and GABRIELA CORTES HOYOS, voice memos made by BALDERRABANO, BELLO and CORTES HOYOS, voice messages received by BALDERRABANO, BELLO and CORTES HOYOS, social media posts and messages sent or received by BALDERRABANO, BELLO and CORTES HOYOS, and photos taken, sent or received by BALDERRABANO, BELLO and CORTES HOYOS will identify the individuals with whom BALDERRABANO and BELLO were communicating prior to their arrests on July 31, 2018, and their means and methods of communication.

21.     Additionally, based on my training and experience, I believe that a review of the information stored on the Devices, including messages sent or received by JOSE ROBERTO BALDERRABANO, RAFAEL BELLO and GABRIELA CORTES HOYOS, social media posts and messages sent or received by BALDERRABANO, BELLO and CORTES HOYOS, and photos sent or received by BALDERRABANO, BELLO and CORTES HOYOS, will reveal photographs of BALDERRABANO, BELLO and CORTES HOYOS with narcotics, photographs of BALDERRABANO, BELLO and CORTES HOYOS in the clothing they were wearing on July 31, 2018, and messages that explain why BALDERRABANO was in possession of heroin on July 31, 2018, including his familiarity with narcotics and his association with individuals involved in the importation and distribution of narcotics.

22.     The Devices are currently in the lawful possession of HSI. Device 1 was seized with the consent of JOSE ROBERTO BALDERRABANO, and pursuant to his border crossing and incident to his arrest. Device 2 and Device 3 were seized incident to RAFAEL BELLO's arrest. I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

23.     The Devices are currently in the possession of HSI in the Eastern District of New York. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of HSI.

## TECHNICAL TERMS

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

9

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.

       This storage media can contain any digital data, including data unrelated to photographs or videos.

  c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the

    antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  25. Based on my training, experience, and research, I know that those who are engaged in the distribution of a controlled substance often communicate with others to plan and execute the distribution by means of wireless telephone (including by means of text messages, electronic mail and social media messages), and record the contact information of criminal associates in the "contacts" section of such telephones. Those who commit such offenses may retain evidence of their participation in such offenses on wireless telephones through call records, text messages, WhatsApp messages, Facebook messages, Instagram messages, e-mails or photos.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

  26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

  27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that may expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
MICHAEL YUN
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on September 11, 2018:
    S/ RAMON E. REYES

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT A

The property to be searched is: one NAVY BLUE SAMSUNG S9+ WITH IMEI 357633091107208 ("Device 1"), one BLACK IPHONE MODEL A1660 WITH FCC ID BCGE3085A AND IC 579C-E3085A ("Device 2"), and one WHITE SAMSUNG GALAXY AMP PRIME WITH IMEI 356519079241146 ("Device 3," and, together with Device 1 and Device 2, the "Devices"). The Devices are currently in the possession of the HSI in the Eastern District of New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 922(g) and 924(c) and 21 U.S.C. §§ 841, 846, 952(a)(1) and 963, and involve JOSE ROBERTO BALDERRABANO, RAFAEL BELLO and/or GABRIELA CORTES HOYOS since July 1, 2018, including:

    a. any information related to the possession of narcotics by BALDERRABANO, BELLO and/or CORTES HOYOS;

    b. lists or contact information for individuals dealing in narcotics and related identifying information;

    c. lists of customers and related identifying information;

    d. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    e. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    f. any information recording any schedule or travel from July 1, 2018 to the present for BALDERRABANO, BELLO and/or CORTES HOYOS;

    g. all bank records, checks, credit card bills, account information, and other financial records.

2.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.